T.C. Memo. 1998-305


UNITED STATES TAX COURT


ASA INVESTERINGS PARTNERSHIP,
ALLIEDSIGNAL INC., TAX MATTERS PARTNER, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 27320-96.               Filed August 20, 1998.


Jerome B. Libin, Steuart H. Thomsen, David A. Roby, Jr.,
William S. Corey, Robert S. Chase II, Alexa Temple Dubert, and H.
Karl Zeswitz, Jr., for petitioner.

Jill A. Frisch, Anne O. Hintermeister, Leslie J. Spiegel,
Peter J. Graziano, James M. Guiry, and Robert A. Baxer, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, Judge:  Respondent issued ASA Investerings

Partnership (ASA) a notice of final partnership administrative adjustment (FPAA) that reflected adjustments to ASA's partnership return for taxable years which ended on May 31, 1990, May 31, 1991, December 31, 1991, and June 1, 1992. On December 24, 1996, AlliedSignal Inc. (AlliedSignal), ASA's tax matters partner, petitioned the Court to redetermine respondent's adjustments to partnership items.

ASA was created by AlliedSignal, AlliedSignal Investment Corp., Barber Corp. N.V., and Dominguito Corp. N.V. The primary issue for decision is whether these corporations formed a valid partnership for Federal income tax purposes. We hold that they did not.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. On the date AlliedSignal filed the petition, ASA had no principal place of business because it had previously ceased operations.

I. AlliedSignal and the Merrill Lynch Proposal

AlliedSignal, a Delaware corporation, is a manufacturing company that produces aerospace and automotive products. It was formed in September 1985 when Allied Corp. merged with The Signal Companies, Inc.

In January 1990, AlliedSignal decided to sell its interest in Union Texas Petroleum Holdings, Inc. (UTP), an oil, gas, and petrochemical company. AlliedSignal expected to sell its interest before February 1991 and to realize a capital gain of approximately $446,700,000. Robert Luciano, a member of AlliedSignal's Board of Directors (the Board), informed AlliedSignal's Chief Financial Officer, John Barter, that Merrill Lynch & Co., Inc. (Merrill Lynch), an investment bank, had developed a tax proposal that could create capital losses to shelter AlliedSignal's anticipated capital gain. Mr. Luciano, who also served on Merrill Lynch's Board of Directors, further explained that he was associated with another corporation that had participated in a similar Merrill Lynch-designed transaction.

AlliedSignal decided to get more information about the proposal. In February 1990, E.S.P. Das, Merrill Lynch's Vice-Chairman of Investment Banking, and other Merrill Lynch representatives, described the plan to Roger Matthews, AlliedSignal's Assistant Treasurer, and other AlliedSignal representatives. The proposal, according to Merrill Lynch's representatives, included the following steps:

1. A partnership is formed by AlliedSignal with a foreign partner not subject to U.S. taxation.

2. The partnership is capitalized with cash contributions, primarily from the foreign partner, who would be the majority partner after the initial contributions.

3.  The partnership purchases high-grade, floating-rate private placement notes (PPNs), which include put options, permitting the notes to be sold to the issuer at par.

4.  The partnership sells the PPNs for consideration consisting of 80 percent cash and 20 percent LIBOR-indexed installment notes (LIBOR notes)[1].

5.  The partnership reports the sale of the PPNs using the installment method under section 453.  The gain is allocated according to each partner's partnership interest (i.e., the foreign partner recognizes most of the gain).

6.  The partnership purchases high-grade financial instruments.  Income on such instruments is allocated among the partners.

7.  AlliedSignal buys a portion of the foreign partner's interest and becomes the majority partner.

8.  The partnership distributes the LIBOR notes to AlliedSignal and cash to the foreign partner. AlliedSignal sells the LIBOR notes.

9.  The partnership liquidates within 12 to 24 months of formation.

Merrill Lynch's representatives explained that the PPN sale could be reported pursuant to the installment sale rules.  Under these rules, a small fraction of the PPNs' basis would be used to calculate the gain on the sale and the remaining basis would be allocated to the LIBOR notes.  Thus, the PPN sale would create a large capital gain, and the LIBOR note sale would create a large

---

[1]  LIBOR (London Interbank Offering Rate) is the interest rate that most international banks dealing in Eurodollars charge each other for large loans.  The contingent obligations are called LIBOR notes because payments are based on the product of LIBOR times a notional amount.

capital loss.  The tax-exempt foreign partner would be allocated most of the capital gain, and AlliedSignal would realize the capital loss.

Merrill Lynch representatives further explained that the proposal was a package deal.  Merrill Lynch would serve as the partnership's[2] financial adviser and, for a $7 million fee, recruit the foreign partner and arrange for the issuance and sale of the PPNs and LIBOR notes.  To ensure a market for such issuance and sale, Merrill Lynch would structure and enter into the requisite swap transactions.  Merrill Lynch would also serve as the partnership's financial intermediary, earning an additional $1,060,000 to $2,130,000 on the PPN sale and $212,000 to $425,000 on the LIBOR note sale.  The foreign partner, for its participation in the transaction, would charge AlliedSignal the greater of $2,850,000 or 75 basis points (b.p.)[3] on funds advanced to the partnership.  In addition, AlliedSignal would pay all of the partnership's expenses.  Merrill Lynch estimated that AlliedSignal's total expenses for the entire venture[4] would be

---

[2]  We refer to ASA as a "partnership" and AlliedSignal, ABN, ASIC, Barber, and Dominguito as "partners".  These terms are used for convenience and are not intended to have any legal significance.

[3]  One basis point is equal to 1/100th of 1 percent.

[4]  We refer to the entire series of transactions as the "venture".  This term is used for convenience and is not intended to have any legal significance.

between $11,300,000 and $12,600,000.

In March 1990, G. Peter D'Aloia, AlliedSignal's Treasurer and Vice President of Taxes, and Mr. Barter, presented the plan to Edward Hennessy, AlliedSignal's Chairman and CEO. Mr. Barter and Mr. D'Aloia recommended that Mr. Hennessy approve the plan because of its tax advantages. Mr. Hennessy decided that the proposal should be presented at the Board's April 30, 1990, meeting and that prior to such meeting the Board's Executive Committee should consider the proposal. On April 16, 1990, the Board's Executive Committee convened, and Mr. D'Aloia described the proposal and its essential steps. Although the foreign partner's identity had not yet been revealed to AlliedSignal, the executive committee approved the proposal and an initial $110 million contribution. Two weeks later, after a brief presentation of the proposal's potential tax benefits, the Board approved the venture.

## II.  Algemene Bank Netherlands N.V.

Prior to April 16, 1990, Mr. Matthews was concerned that the venture's success would depend on the post-formation decisions of a foreign partner whose identity had not yet been revealed to AlliedSignal. When he expressed this concern to Merrill Lynch, Mr. Das assured him that the foreign partner would be an AA- or AAA-rated international bank that would participate in the venture at AlliedSignal's direction. Although AlliedSignal had

not yet been told, Merrill Lynch had already chosen Algemene Bank Netherlands N.V. (ABN) to serve as the foreign partner.

ABN, one of The Netherlands' largest commercial banks, had participated in several similar Merrill Lynch-designed transactions. ABN and AlliedSignal already had a lending relationship, but ABN believed it could strengthen that relationship by participating in the venture and being a compliant partner.

Mr. Johannes den Baas, Vice President of Corporate Finance for ABN New York, an ABN affiliate, was responsible for getting the venture approved. In seeking such approval, Mr. den Baas followed ABN's standard procedures for processing loans in excess of $25 million. Accordingly, the transaction was processed through and approved by ABN's North American Credit Committee, Foreign Credit Department, and headquarters.

On April 5, 1990, Mr. den Baas sent ABN's Risk Management Division a memorandum, credit proposal, and AlliedSignal's financial statements. He requested authorization to enter into the venture with AlliedSignal, form two corporations, and lend $990 million to these corporations. The corporations would contribute the $990 million to the venture. Realizing that ABN officials would be concerned about repayment dates, he attached to the credit proposal the following "calendar of events":

> First week of August [1990], Allied Signal Inc. will purchase $490mm. of the * * * [corporations'] interests

directly reducing ABN's involvement to $500mm.

First week of December 1990, the * * * [corporations'] interests will be further reduced by $300mm., either by direct buy-down or distribution of assets from the partnership, to $200mm.

First week of May 1992, the * * * [corporations] will be taken out of the partnership fully.

Mr. den Baas described the purpose of the transaction as "the same as all the other Curacao based partnerships". The memorandum further stated:

AlliedSignal Inc. has a capital gain tax liability and this will cure their liability.

The remuneration will be 30 bps. on the loan * * * to the * * * [corporations] plus a fee directly from Allied Signal Inc. to ABN New York representing an additional 45 bps. over the outstanding amounts bringing the total to 75 bps. over LIBOR. Furthermore Allied Signal Inc. will make ABN whole for the difference between * * *[commercial paper] and LIBOR * * * upfront. The net income will be $5.5mm. received partly over time in the loan and partly in fees from Allied Signal Inc.

ABN knew that the partnership's income allocations alone would not provide the requisite return (i.e., 75 b.p. over LIBOR on funds transferred to the partnership). AlliedSignal would have to supplement these allocations with direct payments to ABN. As Mr. den Baas stated in another internal memorandum:

Since the * * * [partnership] structure itself will not carry the possibilities for * * * [a return of 70-80 b.p. over LIBOR], income will be received by ABN New York in upfront payments made by * * * [AlliedSignal].

Although generally comfortable with the venture, ABN officials expressed concern regarding a potential loss relating

to the sale of the PPNs.  In an April 22, 1990, memorandum, Mr. den Baas assured them that any such loss would be added to the value of the LIBOR notes and, ultimately, borne by AlliedSignal when the LIBOR notes were distributed to it.  ABN officials wanted this arrangement included in the partnership agreement but Mr. den Baas explained that a written agreement was not feasible:

> Of course, this arrangement cannot be included in the documentation since in that case it would not be a matter of a general partnership.  Even a side letter would seriously weaken this position. * * *

Mr. den Baas further explained that if AlliedSignal reneged on its promise to bear any loss relating to the sale, ABN would not allow the partnership to distribute the LIBOR notes to AlliedSignal.  After receiving these and other assurances, the loan-approval committees authorized ABN's participation in the venture.

III.  Formation of ASA

A.  The Bermuda Agreement

In Bermuda, on April 17 and 18, 1990, Mr. Matthews, Mr. den Baas, and Peter H. de Beer, Deputy Managing Director of ABN Trust Company Curacao N.V. (ABN Trust), an ABN affiliate, met together for the first time.  Prior to this meeting, Merrill Lynch carefully explained the proposal to both ABN's and AlliedSignal's representatives.  As a result, all parties entered the meeting with a detailed understanding of the venture and their respective obligations.  The negotiations between AlliedSignal and ABN

focused on ABN's expected return and the venture's transaction costs. These negotiations culminated in various agreements, which we refer to collectively as "the Bermuda Agreement".

Mr. Matthews and Mr. den Baas agreed that AlliedSignal would pay all of the partnership's expenses and that AlliedSignal would pay ABN a return, which we refer to as ABN's "specified return", equal to ABN's funding costs (i.e., approximately LIBOR) plus 75 b.p. on funds advanced to the partnership. ABN's specified return consisted of income allocations, and AlliedSignal's direct payments, to ABN. In essence, the direct payments would equal the difference between the specified return and the income allocations. The precise amount of the specified return would depend on the amount of ABN funds held by the partnership and the amount of time that the partnership held such funds. AlliedSignal and ABN also agreed that ABN would receive partial repayment during the partnership's existence (i.e., August 1990 and March 1991) and full repayment by May 1992.

Mr. den Baas wanted AlliedSignal to pay "up-front" $5 million of the specified return. Mr. Matthews, however, wanted to delay the payment as long as possible to ensure ABN's adherence to the venture's scheduled steps. Mr. den Baas and Mr. Matthews discussed various ways to characterize and structure AlliedSignal's direct payments to ABN. Ultimately, they decided to characterize some of these payments as "premiums". They

further agreed that these premium payments would be made upon the occurrence of certain events.

B.  Structure and Funding of ASA

On April 18, 1990, AlliedSignal formed AlliedSignal Investment Corp. (ASIC), a wholly owned subsidiary.  On the same day, Barber Corp. N.V. (Barber) and Dominguito Corp. N.V. (Dominguito) were formed.  Each corporation was owned by two Netherlands Antilles foundations controlled by ABN Trust:  Barber was owned by the Demian Foundation and the Freya Foundation, while Dominguito was owned by the Aida Foundation and the Carmen Foundation.  Each foundation contributed $3,000 to its corporation in exchange for 3,000 shares with a par value of $1 per share.  Thus, Barber and Dominguito were each capitalized with $6,000.

Barber, Dominguito, and ABN entered into revolving credit agreements that provided for Barber and Dominguito to pay ABN interest of LIBOR plus 30 b.p. on the loans.  These loans would be secured by the stock held by the foundations and, thus, indirectly by Barber's and Dominguito's partnership interests. Barber, Dominguito, and ABN also entered into subordinated loan agreements that provided for interest-free loans from ABN to Barber and Dominguito.  In addition, each foundation granted ABN an irrevocable option to acquire, at par value, the shares of the respective corporation that each foundation owned.

On April 19, 1990, AlliedSignal, ASIC, Barber, and Dominguito formed ASA as a partnership under New York law. In April and May 1990, they transferred a total of $1,100,000,000 to ASA. The following chart delineates the amount of funds transferred by each partner:

|  | Amount Transferred to ASA | Percentage Interest in ASA |
|---|---|---|
| AlliedSignal | $99,000,000 | 9 |
| ASIC | 11,000,000 | 1 |
| Dominguito | 594,000,000 | 54 |
| Barber | 396,000,000 | 36 |

The funds that Barber and Dominguito transferred to ASA had been borrowed from ABN pursuant to their respective revolving credit agreements.

C. The Partnership Agreement

On April 18, 1990, the partners executed the ASA partnership agreement. The partnership agreement did not incorporate the Bermuda Agreement but provided guidance in the following areas:

Purpose: ASA would be organized:

for the object and purpose of making investments in notes, bonds, debentures, and other interest bearing instruments, owning, managing and supervising such investments, sharing the profits and losses therefrom, and engaging in such activities necessarily incidental or ancillary thereto. The Partnership is also being organized to enable * * * [AlliedSignal and ASIC] to reduce their credit risk exposure on investments while obtaining a yield in excess of what they could obtain from U.S. treasury securities and to enable * * * [Barber and Dominguito] to earn a rate of return in excess of the rate available on direct investments in the securities which the Partnership plans to purchase.

Management:  ASA would be governed by a partnership committee, consisting of Mr. Matthews, representing AlliedSignal and ASIC, and Mr. de Beer, representing Barber and Dominguito. An act of the partnership committee generally would require the consent of partners whose partnership percentages totaled at least 95 percent.

Income Allocations:  Generally, ASA's net income would be allocated as follows:  If the combined capital of Barber and Dominguito exceeded 50 percent of the capital of all the partners, income would be allocated first to AlliedSignal and ASIC in an amount limited to their invested capital multiplied by the 90-day Treasury bill rate plus 10 b.p., then to Barber and Dominguito in an amount limited to their invested capital multiplied by LIBOR plus 1 b.p., and the balance to each partner in proportion to its respective partnership interest.  If Barber's and Dominguito's combined capital did not exceed 50 percent, net income would be allocated in proportion to each partner's interest.

Loss Allocations:  Generally, ASA's losses would be allocated to each partner in proportion to its respective partnership interest.  Any loss attributable to the bankruptcy of an issuer of a debt instrument, however, would be allocated as follows:  If the combined capital of Barber and Dominguito

exceeded 50 percent of the capital of all the partners, loss would be allocated first to Barber and Dominguito to the extent of the positive balance in their book capital accounts; then to AlliedSignal and ASIC to the extent of the positive balance in their book capital accounts; and the balance to each partner in proportion to its respective partnership interest. If Barber's and Dominguito's combined capital accounts did not exceed 50 percent, such loss would be allocated in proportion to each partner's interest.

Capital Contributions: No interest would be paid on any capital contributions to the partnership, and capital accounts would be maintained in accordance with section 1.704-1(b), Income Tax Regs.

D. Miscellaneous ASA Matters

ASA engaged Merrill Lynch as its financial adviser (e.g., Merrill Lynch calculated the value of ASA's investments) and N.V. Fides, a Netherlands Antilles affiliate of ABN, as its investment adviser. The Curacao office of N.V. Fides was the principal office of ASA, and all of ASA's business was to be conducted at such office. Pursuant to authorization from N.V. Fides, ABN opened the "ASA Investerings Partnership Custody Account" at ABN New York's office and placed ASA's commercial paper in ABN New York's vault at Bankers Trust. ASA adopted a fiscal year ending on May 31 (i.e., consistent with Dominguito's, the majority

partner's, fiscal year).

IV.  ASA's Transactions

A.  Purchase of PPNs

On April 25, 1990, ASA purchased $850 million of 5-year PPNs with put options exercisable on November 20, 1991.  Of these PPNs, $350 million were issued by the Long Term Credit Bank of Japan (LTCB) and rated AA by Standard and Poor's.  The remaining $500 million of PPNs was issued by Sumitomo Bank Capital Markets, Inc. (Sumitomo), and rated AA+ by Standard & Poor's.

Merrill Lynch induced LTCB to issue the PPNs by arranging basis swaps (i.e., the exchange of payments based on one variable interest rate for payments based on another variable interest rate) that converted LTCB's cost of capital for issuing the PPNs to an attractive sub-LIBOR interest rate.  These swaps provided that Merrill Lynch would pay LTCB an amount equal to the coupon rate of the LTCB PPNs.  In exchange, LTCB paid Merrill Lynch a sub-LIBOR rate on the face amount of the PPNs.

B.  Sale of PPNs and Acquisition of LIBOR Notes

On May 8, 1990, the ASA partnership committee met in Bermuda and adopted a resolution authorizing and directing the sale of the PPNs for consideration consisting of approximately 80 percent cash and 20 percent LIBOR notes.  Between May 17 and 24, 1990, ASA sold the PPNs to Mitsubishi Bank, Ltd. (Mitsubishi) and Banque Francaise du Commerce Exterieur (BFCE).  Standard and

Poor's rated Mitsubishi AA+ and BFCE AAA.  In exchange for the PPNs, ASA received $681,300,000 and 11 LIBOR notes.  ASA used the $681,300,000 to purchase time deposits and 30-day commercial paper.

The LIBOR notes had a total notional principal amount of $434,749,000.  Each of the 11 LIBOR notes required 20 quarterly payments of an amount equal to 3-month LIBOR (i.e., determined at the beginning of each payment period) multiplied by approximately 25 percent of the note's notional principal amount.  Payments were to commence on August 31, 1990, and end on May 31, 1995.

ABN entered into a complex series of Merrill Lynch-designed swap transactions involving itself, Barber, Dominguito, and Merrill Lynch.  These swaps fully hedged ABN's interest rate risk relating to the LIBOR notes.  Merrill Lynch also structured and entered into swap transactions with Mitsubishi and BFCE to induce their participation in the venture.

### 1.  Cost of Selling the PPNs

Merrill Lynch initially told AlliedSignal that the sale of the PPNs would cost between $1,060,000 and $2,130,000.  On April 13, 1990, 3 days before the executive committee meeting, Merrill Lynch told AlliedSignal that the PPN sale would cost approximately $4,250,000.  Merrill Lynch ultimately imposed a cost of $6,375,000 on the PPN sale.  This cost was imposed through a reduction in the value of the consideration received by

ASA (i.e., the $434,749,000 notional principal amount of the LIBOR notes would have been greater without the cost). Merrill Lynch valued the LIBOR notes at $163,931,068, which was calculated as follows:

| | |
|---|---|
| Face Amount | $850,000,000 |
| Less: | |
| 75 b.p. cost | (6,375,000) |
| Net Amount | 843,625,000 |
| Plus: | |
| Accrued Interest | 1,606,068 |
| Less: Cash | (681,300,000) |
| Value | 163,931,068 |

On its partnership books, ASA recorded the LIBOR notes' value at $170,306,068 (i.e., adding $6,375,000, attributable to the cost of the PPNs sale, to the $163,931,068 fair market value of the LIBOR notes).

### 2. Installment Sale Reporting

Because the LIBOR notes provided for 20 quarterly payments that varied with LIBOR, ASA could not determine the PPNs' aggregate selling price by the end of its May 31, 1990, taxable year. Pursuant to section 15A.453-1(c), Temporary Installment Sales Regs., 46 Fed. Reg. 10711 (Feb. 4, 1981), ASA used the installment method for contingent payment sales to report the sale of the PPNs. This regulation provides for the ratable allocation of basis over the term of a fixed-term contingent obligation.

For the taxable year ending May 31, 1990, ASA recovered $141,856,639 (i.e., 1/6) of its reported $851,139,836 basis in

the PPNs and reported $539,443,361 of capital gain on the sale (i.e., $681,300,000 minus $141,856,639).  The gain was allocated among the partners as follows:

|  | Percentage Interest in ASA | Gain |
|---|---|---|
| ASIC | 1 | $5,394,434 |
| AlliedSignal | 9 | 48,531,902 |
| Barber | 36 | 194,199,610 |
| Dominguito | 54 | 291,299,415 |
| Total | 100 | 539,425,361 |

The installment payments would be received on the LIBOR notes over 5 additional partnership taxable years (i.e., May 31, 1991, through May 31, 1995).

V.  AlliedSignal Purchases Majority Interest in ASA

On August 2, 1990, AlliedSignal issued $435 million of commercial paper.  On the same day AlliedSignal purchased an additional interest in ASA for $545 million.  AlliedSignal purchased 36 percent of ASA from Barber for $397,438,000 and 13.43 percent of ASA from Dominguito for $147,562,000.  The $545 million AlliedSignal paid consisted of a $540,600,000 payment equal to the value of Barber's and Dominguito's interest (i.e., 49.43 percent of $1,093,657,933) and a $4,400,000 premium payment.  AlliedSignal paid the $4,400,000 to compensate for the shortfall between ABN's specified return and Barber's and Dominguito's income allocations.  After these purchases, the ASA interests held by AlliedSignal, ASIC, Barber, and Dominguito were 58.43 percent, 1 percent, 0 percent, and 40.57 percent,

respectively.

In anticipation of AlliedSignal's purchase, ASA revalued its assets at $1,093,657,933. This value included the LIBOR notes valued at $163,964,000. The value of the LIBOR notes reflected a $6,342,068 decrease in value since their acquisition and included $6,375,000 attributable to the cost of selling the PPNs.

After the August 2 purchase, AlliedSignal and Merrill Lynch entered into five swaps designed to hedge AlliedSignal's and ASIC's combined 59.43 percent interest in the LIBOR notes. Swaps one through four were designed to eliminate the yield curve risk (i.e., the risk from the movement of long-term, relative to short-term, interest rates). These swaps required AlliedSignal to pay Merrill Lynch, on a quarterly basis, a fixed rate times various notional principal amounts in exchange for quarterly payments of 3-month LIBOR on those same amounts. The fifth swap required AlliedSignal to make quarterly payments of 3-month LIBOR times a certain notional principal amount, in exchange for quarterly payments of a fixed rate times the same notional principal amount.

Between August 31 and September 28, 1990, AlliedSignal borrowed $435 million from ASA by issuing ASA $435 million of short-term notes (AlliedSignal Short-Term Notes). These notes had a maturity date of December 28, 1990, a money-market yield, and put and call options exercisable at par on a monthly basis.

AlliedSignal used proceeds from the loan to extinguish the commercial paper it had issued on August 2, 1990.  AlliedSignal and ASA, in a series of extensions, changed the maturity of the AlliedSignal Short-Term Notes from December 28, 1990, to December 31, 1993.

VI.  <u>ASA Distributes the LIBOR Notes to AlliedSignal</u>

On August 21, 1990, the ASA partnership committee met in Bermuda and authorized a distribution of assets.  The minutes of this meeting state:

> The Representative of Dominguito Corporation N.V. expressed concern over the volatility of the investments.  He stated that Dominguito would prefer cash in any distribution from the Partnership.  The Representative of Allied-Signal Inc. and Allied-Signal Investment Corporation voiced his opinion that they expected favorable interest rate fluctuations.  He stated that they would prefer to receive Installment Purchase Agreements in any distribution of assets of the Partnership.

Following this meeting, ASA distributed $167,469,860 of LIBOR notes to AlliedSignal, $2,866,140 of LIBOR notes to ASIC, and $116,279,033 in cash and commercial paper to Dominguito.

For purposes of the distribution, ASA valued the LIBOR notes at $170,336,000.  The value of the LIBOR notes reflected a $6,372,000 increase in value since August 2, 1990, and included $6,375,000 attributable to the cost of selling the PPNs.  The distribution of LIBOR notes resulted in AlliedSignal bearing the entire $6,375,000 cost of selling the PPNs (i.e., such cost was embedded in the value of the LIBOR notes).  In addition,

AlliedSignal's and ASIC's combined interest in the LIBOR notes increased from an approximately 60-percent indirect interest to a 100-percent direct interest.

AlliedSignal determined that the LIBOR notes' basis was $709,283,197, computed as follows:

| Initial Cost Basis | 1/6 of Cost Basis Allocated to 5/31/90 FYE | | Computed Basis on Distribution |
|---|---|---|---|
| $851,139,836 | − $141,856,639 | = | $709,283,197 |

AlliedSignal determined that $697,348,518 of this basis should be allocated to the LIBOR notes it received and $11,934,677 to the LIBOR notes ASIC received.

## VII. AlliedSignal Sells A Portion of the LIBOR Notes

During 1990, AlliedSignal and ASIC sold LIBOR notes for a total of $50,454,103. The following chart delineates these sales:

| Date | Purchaser | Basis As Reported By AlliedSignal | Sale Price |
|---|---|---|---|
| 9-06-90 | Unibank A/S | $82,599,556 | $17,502,543 |
| 11-16-90 | Generale Bank | 82,843,620 | 17,129,250 |
| 11-30-90 | Unibank A/S | 81,077,631 | 15,822,310 |
| Total | | 246,520,807 | 50,454,103 |

AlliedSignal determined that these LIBOR notes had a total basis of $246,520,807. Accordingly, on its 1990 Federal income tax return, AlliedSignal reported $196,066,704 of capital losses (i.e., $50,454,103 minus $246,520,807) relating to the sale of the LIBOR notes and a capital gain of $53,926,336 relating to the

sale of the PPNs. AlliedSignal filed a Form 1139 claiming a $27,151,087 refund in 1987 attributable to a $181,628,283 net capital loss carryback (i.e., some of which was attributable to other capital gains and losses AlliedSignal incurred in 1990). After the 1990 LIBOR note sale, ASIC held no LIBOR notes and AlliedSignal held LIBOR notes with a total notional principal amount of $280,810,000. The total cost of selling the LIBOR notes was $6,110,000, rather than Merrill Lynch's initial estimate of less than $500,000.

Merrill Lynch structured and entered into swap transactions that transferred the interest rate risk of the LIBOR notes from Generale Bank and Unibank A/S to Merrill Lynch. These swaps were an effective inducement for the banks to buy the LIBOR notes. On November 9, 1990, AlliedSignal entered into its sixth swap with Merrill Lynch to further hedge its interest rate risk relating to its LIBOR notes. After this swap was in place, AlliedSignal was hedged on 94 percent of its LIBOR notes. On November 13, 1990, AlliedSignal purchased 5-year Treasury futures to lock in interest rates on the LIBOR notes it intended to sell later that month.

VIII. Dominguito's Partnership Interest Is Reduced

On November 22, 1991, ASA redeemed 7.57 percent of Dominguito's interest for $91,898,434. The redemption reduced Dominguito's interest to 33 percent and increased AlliedSignal's

and ASIC's respective interests to 65.87 and 1.13 percent.

Throughout the venture, AlliedSignal and ABN carefully calculated the shortfall between ABN's specified return and Barber's and Dominguito's income allocations. On its 1990 financial records, AlliedSignal recorded the shortfall as an accrued liability, thereby treating the amount as a present obligation. On December 5, 1991, after calculating a shortfall, AlliedSignal paid ABN $1,631,250. The payment consisted of: $765,147 (i.e., the difference between ABN's funding cost and Barber's and Dominguito's combined income allocations); $231,250 (i.e., interest on $92 million of ABN funds that remained in ASA until November, rather than March 1991, as had been established in the Bermuda agreement); and $634,853. The $634,853 payment was the difference between the $5 million ABN requested that AlliedSignal pay "up-front" and the $4,400,000 AlliedSignal paid on August 2, 1990, plus interest. AlliedSignal and ABN had considered making this payment in the form of a "consulting fee", but they ultimately decided against this characterization.

On April 8, 1992, ASA redeemed 8 percent of ASA from Dominguito for $76,961,863. After the distribution, the ASA interests held by AlliedSignal, ASIC, and Dominguito were 73.74 percent, 1.26 percent, and 25 percent, respectively.

IX. ASA Is Liquidated

During April and May 1992, AlliedSignal representatives and

Mr. den Baas discussed ABN's specified return and the liquidation of ASA.  Mr. den Baas provided AlliedSignal with a schedule comparing Barber's and Dominguito's income allocations.  The schedule indicated that from November 22, 1991, through April 30, 1992, Barber's and Dominguito's income allocations exceeded ABN's funding costs by $152,162.  AlliedSignal prepared several analyses regarding ABN's return.  Some of these analyses included a determination of what ABN's return would have been if AlliedSignal had made a $5 million payment "up-front" and if all of Dominguito's interest in ASA had been redeemed by May 1992. Based upon these analyses, AlliedSignal suggested that ABN pay AlliedSignal $225,741, plus the $152,162 set forth in ABN's schedule.  Ultimately, ABN agreed to pay AlliedSignal $315,000.

On May 1, 1992, ASA tendered the AlliedSignal Short-Term Notes to AlliedSignal, in return for a payment of $435 million plus accrued interest of $1,646,522.  On the same day, ASA purchased newly issued 30-year AlliedSignal notes (the AlliedSignal Long-Term Notes).  The AlliedSignal Long-Term Notes had a $480 million total notional principal amount and a 9.23 percent interest rate.  On May 20, 1992, ASA exchanged the AlliedSignal Long-Term Notes for all the stock of ASA Investments, Inc., a wholly owned subsidiary of ASA, which was formed to participate in the liquidation of ASA.

On May 28, 1992, ASIC was liquidated into AlliedSignal and

its 1.26 percent ASA interest was transferred to AlliedSignal, leaving AlliedSignal and Dominguito as ASA's remaining partners (i.e., AlliedSignal owned 75 percent and Dominguito owned 25 percent).

On June 1, 1992, representatives of AlliedSignal and Dominguito met in Bermuda and liquidated ASA. They allocated $2.3 million of accrued interest on the AlliedSignal Long-Term Notes to AlliedSignal; allocated $624,741 of ASA's income to Dominguito; and transferred $315,000, as previously agreed, from Dominguito's capital account to AlliedSignal's capital account. Upon liquidation, AlliedSignal received $3,756,307 and all the stock of ASA Investments, Inc., and Dominguito received $150,995,457 and a $10 million MCA Funding Corp. note.

X. Barber and Dominguito Are Liquidated

After AlliedSignal's August 1990 purchase of Barber's interest, ABN exercised its options to acquire, from the Demian and Freya foundations, Barber's shares at par (i.e., $6,000). Barber immediately declared a dividend in the amount of its remaining earnings and current profits. Three days later, the Demian and Freya foundations reacquired these shares and liquidation proceedings subsequently commenced. Similarly, following the liquidation of ASA, ABN acquired the amount received from the liquidation of Dominguito's ASA interest.

XI. AlliedSignal Sells the Remaining LIBOR Notes

On September 28, 1992, UTP redeemed all of AlliedSignal's preferred stock and warrants for $355 million.  On November 18, 1992, in a secondary public offering, AlliedSignal tendered all of its UTP common stock for $585 million.  Thus, AlliedSignal disposed of its entire interest in UTP for a total of $940 million.

On November 30, 1992, AlliedSignal sold its remaining LIBOR notes to BFCE for $33,431,000.  AlliedSignal calculated a basis of $429,665,738 for these notes and on its 1992 Federal income tax return, reported a capital loss of $396,234,738 on the sale. AlliedSignal also reported a capital gain of $264,667,000 on the sale of its UTP interest.  After taking account of other capital gains and losses, AlliedSignal had a net capital loss of $144,741,887.

XII.  Contribution, Distribution, and Expense Summary

AlliedSignal and ASIC contributed $110 million to ASA and purchased Barber's and Dominguito's ASA interests for $540,600,000 (i.e., a total investment of $650,600,000) and ultimately received distributions from ASA totaling $712,678,500. AlliedSignal made direct payments to Barber, Dominguito, and ABN totaling $5,716,250; paid $47,872,343 in interest on the loan from ASA; received $40,983,490 from its swap transactions; and paid $24,783,800 of expenses relating to transaction costs (i.e.,

attributable to the sale of the PPNs and LIBOR notes) and various fees (i.e., Merrill Lynch's legal, accounting, and various financial services fees).

Barber and Dominguito collectively contributed $990 million to ASA and ultimately received $1,046,720,226. The $1,046,720,226 consisted of: $540,600,000 from AlliedSignal's August 2, 1990, purchase of all of Barber's, and a portion of Dominguito's, interests; $168,860,297 from redemptions of Dominguito's interest; $331,543,679 in income and property distributions to Barber and Dominguito; and $5,716,250 in direct payments from AlliedSignal to Barber, Dominguito, and ABN. ABN ultimately received all payments to Barber and Dominguito. In addition, ABN received $5,851,355 from its swap transactions.

XIII. Respondent's Determinations

On September 27, 1996, respondent issued the FPAA. In the FPAA, respondent disallowed the capital gain, portfolio income, portfolio expenses, and a portion of the basis in the LIBOR notes reported by ASA. Respondent reallocated 90 percent of such items to AlliedSignal and 10 percent of such items to ASIC.

In the FPAA, respondent contends that ASA is not a valid partnership and that Barber and Dominguito are not partners. As an alternative position, respondent contends that the transactions lack economic substance. Respondent further states that if this contention is sustained, "no gain will be realized

or recognized upon the sale of the * * * [PPNs]."  Accordingly, the primary issue is whether Barber and Dominguito are partners with AlliedSignal and ASIC.[5]

OPINION

I.  Applicable Law

The Internal Revenue Code provides that a partnership includes "a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on".  Secs. 761(a); 7701(a)(2).  The existence of a valid partnership depends on whether:

> considering all the facts--the agreement, the conduct
> of the parties in execution of its provisions, their
> statements, the testimony of disinterested persons, the
> relationship of the parties, their respective abilities
> and capital contributions, the actual control of income
> and the purposes for which it is used, and any other
> facts throwing light on their true intent--the parties
> in good faith and acting with a business purpose
> intended to join together in the present conduct of the
> enterprise.

Commissioner v. Culbertson, 337 U.S. 733, 742 (1949); Maiatico v. Commissioner, 183 F.2d 836, 838 (D.C. Cir. 1950), remanding 12 T.C. 196 (1949).

II.  The Parties

For purposes of our analysis, we disregard Barber and

_____

[5]  Because we agree with respondent's primary contention, we need not decide the economic substance issue.  Cf. ACM Partnership v. Commissioner, T.C. Memo. 1997-115 (addressing the economic substance issue in a similar transaction).

Dominguito. The following facts demonstrate that Barber and Dominguito were ABN's agents. Cf. <u>Commissioner v. Bollinger</u>, 485 U.S. 340 (1988). First, Barber and Dominguito were thinly capitalized shell corporations established for the sole purpose of engaging in the venture. Second, the parties treated ABN as the real participant in the venture and disregarded Barber's and Dominguito's respective corporate forms (e.g., AlliedSignal, on December 5, 1991, paid ABN $1,631,250 for Barber's and Dominguito's participation in the venture). Third, Barber and Dominguito were mere conduits. ABN lent Barber and Dominguito the funds for their respective "capital contributions" and retained options that allowed ABN to purchase Barber's and Dominguito's shares for a de minimis amount. Indeed, Mr. den Baas testified that eventually all Barber's and Dominguito's profit "would come back" to ABN. Similarly, because ASIC is AlliedSignal's wholly owned subsidiary, we consider AlliedSignal, not ASIC, the relevant party. Therefore, the issue is whether AlliedSignal and ABN intended to join together in the present conduct of an enterprise.

III. <u>Joint Undertaking of an Enterprise</u>

To form a valid partnership, AlliedSignal and ABN must have intended to join together in the present conduct of an enterprise. <u>Commissioner v. Culbertson</u>, <u>supra</u> at 742.

Petitioner contends that AlliedSignal and ABN joined together for the common purpose of investing in interest bearing instruments and sharing the profits and losses therefrom. We disagree for reasons that we summarize here and explain at greater length below.

AlliedSignal and ABN had divergent business goals. AlliedSignal entered into the venture for the sole purpose of generating capital losses to shelter an anticipated capital gain. In pursuing this goal, AlliedSignal chose to ignore transaction costs, profit potential, and other fundamental business considerations. In fact, AlliedSignal's Board and the Board's Executive Committee focused only on potential tax benefits when they approved the plan.

In contrast, ABN entered into the venture for the sole purpose of receiving its specified return. This return was independent of the performance of ASA's investments (e.g., the profitability of the LIBOR notes) and the success of the venture (i.e., whether AlliedSignal succeeded in generating capital losses). Moreover, as will be explained, ABN did not have any profit potential beyond its specified return and did not have any intention of being AlliedSignal's partner. In essence, we agree with Justice Frankfurter's statement that if an arrangement does not put all parties "in the same business boat, then they cannot get into the same boat merely to seek * * * [tax] benefits".

Commissioner v. Culbertson, supra at 754 (Frankfurter, J., concurring).

## IV. Partnership Formalities

Petitioner contends that ASA is a bona fide partnership because the purported partners carefully followed partnership formalities. Such formalities may have created a partnership facade, but the conduct of AlliedSignal and ABN demonstrates that the Bermuda Agreement, not the partnership agreement, governed their affairs.

### A. Income Allocations

The partnership agreement provided that ASA's income would be allocated pursuant to a formula. The income allocations, however, were merely an artifice to pay ABN's specified return. AlliedSignal subtracted ABN's income allocations from the specified return and made up the difference with direct payments.

On August 2, 1990, AlliedSignal made the first direct payment to ABN--$4,400,000. The $4,400,000 was credited towards ABN's specified return. On December 5, 1991, AlliedSignal paid ABN an additional $1,631,250, which also was calculated to pay a portion of such return. When the parties later determined that ASA's income allocations, and AlliedSignal's direct payments, to ABN had exceeded the specified return, AlliedSignal demanded and received a $315,000 refund. In sum, ABN was entitled to receive only its specified return--no more and no less.

The payment of the specified return violated the partnership agreement provision that "no interest" was to be paid on capital contributions. The precise amount of this return could not be determined until AlliedSignal and ABN knew ABN's actual interest rate on the funds it advanced and how long such funds were held in the partnership. Petitioner concedes that the direct payments to ABN depended on the amount of time ABN's funds were in ASA, yet it asks this Court to conclude that the partnership provision barring interest on capital contributions was adhered to. We decline to do so. Cf. O'Hare v. Commissioner, 641 F.2d 83, 86 (2d Cir. 1981), (stating "It is hardly likely that a true owner or joint venturer would agree to an arrangement whereby his profit depended upon the timing of the sale rather than the amount of the proceeds of the sale. Such a payment mechanism clearly suggests a fee for the use of credit * * *"), affg. T.C. Memo. 1980-34. The direct payments, and the income allocations, to ABN were interest. Cf. Deputy v. duPont, 308 U.S. 488, 498 (1940) (defining "interest" as compensation for the use or forbearance of money).

Citing Hunt v. Commissioner, T.C. Memo. 1990-248, petitioner contends that even if ABN was entitled to a guaranteed return, such return "is not inconsistent with partnership treatment". Hunt, however, is distinguishable. First, in Hunt, the partnership agreement provided for the guaranteed return. ABN's

specified return, however, was not provided in, and was contrary to, AlliedSignal's and ABN's partnership agreement.  Second, in Hunt, the partner receiving the guaranteed return was also eligible to receive partnership profits in excess of such partner's guaranteed return.  ABN, however, was only entitled to its specified return and nothing more.  Cf. O'Hare v. Commissioner, supra at 87 (stating that the taxpayer's failure to share in any of the profits above his prearranged fee militated against a finding that he was a joint venturer).  Therefore, Hunt v. Commissioner, supra, is inapplicable.

B.  Loss Allocations

The partnership agreement provided that losses would be shared on a pro rata basis.  ABN, however, did not intend to, nor did it actually, share in ASA's losses.

1.  Loss on PPN Sale

Prior to meeting AlliedSignal's representatives, Mr. den Baas told other ABN officials that ABN would not bear any loss relating to the PPN sale.  The Bermuda Agreement was consistent with this representation.  ABN's April 11, 1990, internal memorandum further confirms this agreement.  It states:  "Any possible loss (for whatever reason) on the sale of the medium term notes will be fully borne by Allied Signal."  The parties ensured that AlliedSignal would bear such loss by embedding the cost of the PPN sale in the value of the LIBOR notes (i.e., the

distribution of the LIBOR notes would result in a corresponding decrease in AlliedSignal's capital account).

### 2. Loss on LIBOR Notes

With respect to the LIBOR notes, the only ASA investment with any significant potential to fluctuate in value, ABN intended from the outset, and did, fully hedge its risk. A decline in interest rates, between the LIBOR notes acquisition date and AlliedSignal's August 2 purchase, resulted in a $6,342,068 decline in the LIBOR notes' value. Consequently, AlliedSignal paid $3,134,884 less to acquire Barber's and Dominguito's partnership interests than it would have paid if interest rates had remained constant. This "loss", however, was offset by ABN's swap income. As Mr. den Baas testified, "as soon as the hedge was in place, we didn't care anymore about the principal risk of the LIBOR notes". Moreover, when asked by the Court about ABN's upside potential relating to the LIBOR notes, Mr. den Baas explained that "we certainly took care that it would never happen", because any increase in the value of the LIBOR notes would be offset by losses from ABN's swap transactions.

Petitioner contends that in determining whether ABN bore any risk of loss relating to the LIBOR notes, the Court should not consider swap transactions outside the partnership. This contention, however, is inconsistent with petitioner's assertion that AlliedSignal's swaps were part of an "integrated investment

strategy, which must be analyzed as a whole". Moreover, Merrill Lynch pitched and AlliedSignal purchased this package deal as an "integrated investment strategy" consisting of investments and swaps. ABN's swaps were part of this deal. AlliedSignal was fully aware that ABN, with assistance from the venture's facilitator (i.e., Merrill Lynch) would hedge its risk in the LIBOR notes. All testimony to the contrary was not credible. Accordingly, it is appropriate to consider both AlliedSignal's and ABN's swap transactions.

### 3. Loss Arising From Debt Issuers' Bankruptcy

Petitioner contends, and the partnership agreement provides, that ABN bore the risk of "any ASA loss attributable to the bankruptcy" of the commercial paper, PPN, and LIBOR note issuers. The commercial paper, which constituted most of ASA's portfolio, was AAA-rated, short-term, and from multiple issuers. The PPNs were issued by multiple AA-rated banks and held less than 30 days. The LIBOR notes were issued by multiple AAA-rated banks and held only 3 months. Indeed, Mr. den Baas testified that ASA held a "gorgeous portfolio" of assets and was "like a mini-bank" because it had "its own portfolio" of multiple "stellar" credit risks. In sum, ABN's "risk" relating to these assets was de minimis.

### C. Expenses

The partnership agreement implied that expenses would be

borne by the partners in accordance with their respective interests. Pursuant to the Bermuda Agreement, however, AlliedSignal was obligated to, and did in fact, pay all of ASA's expenses. We also note that AlliedSignal's obligation to bear expenses reduced AlliedSignal's return and undermined the stated purpose of "obtaining a yield in excess of what they could obtain from U.S. treasury securities".

D. <u>Management</u>

The partnership agreement stated that the partners would share in the management of ASA. The agreement provided that ASA's activities would require the "vote or consent" of partners whose partnership percentages totaled at least 95 percent. In reality, however, AlliedSignal made all the critical decisions. ABN was a compliant and accommodating party, which was chosen for the venture because it was willing to serve at AlliedSignal's direction.

The management provision in the partnership agreement was perfunctory, because the scheduled steps were prearranged by Merrill Lynch and agreed to by AlliedSignal and ABN before they executed the partnership agreement. The distribution of the LIBOR notes typifies how management responsibilities were "shared". Before the parties executed the partnership agreement, AlliedSignal had already decided that the LIBOR notes would be

distributed to it.  While the minutes of the August 21, 1990, meeting state that Dominguito's representative preferred cash distributions and expressed concern about the "volatility of the LIBOR notes", ABN had no such concern because it was fully hedged.  The minutes were manufactured to give the impression that ABN was playing an active management role when it was not.  From the outset of their relationship, ABN was fully aware that the LIBOR notes would be distributed to AlliedSignal.

E.  Conclusion

The characteristics of AlliedSignal and ABN's relationship are contrary to the characteristics of a bona fide partnership.  AlliedSignal and ABN had divergent, rather than common, interests.  Moreover, they did not share in the venture's profit and losses and did not comply with their partnership agreement when it conflicted with the Bermuda Agreement.  AlliedSignal and ABN knew that their conduct could jeopardize ASA's partnership status, so they carefully avoided documenting their true intent.  In short, AlliedSignal, ASIC, and ABN's agents--Barber and Dominguito--did not have the requisite intent to join together for the purpose of carrying on a partnership and sharing in the profits and losses therefrom.  Further analysis reveals that AlliedSignal and ABN had a debtor-creditor relationship.

V.  Debtor-Creditor Relationship

Whether parties are in a partnership or a debtor-creditor

relationship is a question of fact to be determined from all the facts and circumstances. <u>Hambuechen v. Commissioner</u>, 43 T.C. 90, 99 (1964); see <u>Dixie Dairies Corp. v. Commissioner</u>, 74 T.C. 476 (1980). "The ultimate question [is] whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture" or represents a loan for which repayment was expected regardless of the success of the venture. <u>Dixie Dairies Corp. v Commissioner</u>, <u>supra</u> at 494. The conduct of AlliedSignal and ABN confirms that they had a debtor-creditor relationship.

A. <u>AlliedSignal</u>

AlliedSignal did not recruit the foreign partner. Instead, it accepted Merrill Lynch's package deal that included a preselected partner. It is both typical and rational for bona fide partners to meet and negotiate prior to engaging in a $1 billion transaction involving numerous steps, complex swap arrangements, and investments in sophisticated financial instruments. Yet, AlliedSignal's Executive Committee approved the plan before it even knew the identity of the foreign partner. The Board approved the plan 2 weeks after the venture began. AlliedSignal, like a typical borrower, was only concerned that a strong, reputable bank was financing the transaction. The identity of the bank was irrelevant.

AlliedSignal spent a considerable amount of time ensuring

that ABN received its specified return and was preoccupied with determining the amount of, and the labels attached to, the direct payments to ABN. Petitioner contends that there was no assurance, commitment, or binding agreement to pay ABN a specified return. AlliedSignal, however, scrupulously calculated the shortfall between Barber's and Dominguito's income allocations and ABN's specified return and recorded this shortfall as an accrued liability for financial purposes. AlliedSignal wanted to ensure that its direct payments, and ASA's income allocations, to ABN were being properly credited toward AlliedSignal's obligation to pay ABN's specified return. In essence, AlliedSignal's conduct resembled that of a meticulous borrower rather than a partner.

B. ABN

From the outset of the venture, ABN processed the ASA transaction just like any other large corporate loan. For loans more than $25 million, ABN required approval from its North American Credit Committee, Foreign Credit Department, and headquarters. Accordingly, ABN New York submitted the loan application relating to the plan, and ABN approved the loan, through the aforementioned channels. Although ABN was, ostensibly, considering a loan to Barber and Dominguito, it evaluated and approved the loan based on AlliedSignal's financial

statements.  In addition, the ABN loan-approval committees authorized the loan only after they were assured that the loan contained terms and degrees of risk commensurate with loans that it ordinarily makes.

ABN, like most prudent lenders, attempted to insulate itself from credit risk by establishing certain safeguards.  It insisted that most of ASA's investments be in high-grade, low-risk, short-term notes.  In addition, by lending the funds through Barber and Dominguito, rather than directly to AlliedSignal, ABN established a direct interest in, what Mr. den Baas characterized as, a "gorgeous portfolio" of AAA-rated, diversified, high-grade assets, rather than a $990 million loan to a single A-rated company.  Furthermore, ABN had collateral for the funds it transferred to ASA, because ASA's commercial paper was physically kept in ABN's vault and ASA's other investments were maintained in a custody account at ABN New York.

ABN merely sought its specified return.  This return was equivalent to interest and was guaranteed by AlliedSignal.  The parties agreed that ABN would be repaid according to a specified schedule, which established fixed maturity dates when ABN was to be repaid (i.e., August 1990, March 1991, and full repayment by May 1992).  If AlliedSignal missed a payment date, it compensated ABN for the prolonged period (e.g., the December 5, 1991, payment of $231,250 of interest because ASA partially redeemed ABN's

interest in November, rather than March, of 1991). In addition, by engaging in swap transactions, ABN restricted its ability to earn "a rate of return in excess of the rate available on direct investments in the securities which the Partnership plans to purchase". Mr. den Baas testified that ABN did not want to gamble on interest rates and that its swaps were designed to prevent ABN from sharing in profits or losses from the LIBOR notes--the ASA asset with the most profit potential.

We must look to the substance of the transactions rather than the form. Hambuechen v. Commissioner, supra at 98; see Gregory v. Helvering, 293 U.S. 465 (1935). When the formalities are stripped away, ABN is in substance a lender. Accordingly, we hold that Barber and Dominguito were not partners in ASA and that the appropriate amount of gain relating to the sale of the PPNs and loss relating to the sale of the LIBOR notes shall be allocated between AlliedSignal and ASIC.

All contentions that have not been addressed are either irrelevant, moot, or meritless.

To reflect the foregoing,

Decision will be entered
under Rule 155.