United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 19, 1999 Decided February 1, 2000 

 No. 98-1583

 ASA Investerings Partnership, et al., 
 Appellants

 v.

 Commissioner of Internal Revenue, 
 Appellee

 Appeal from the United States Tax Court 
 (No. TAX-27320-96)

 Jerome B. Libin argued the cause for appellants. With 
him on the briefs was Steuart H. Thomsen.

 Edward T. Perelmuter, Attorney, U.S. Department of Jus-
tice, argued the cause for appellee. With him on the brief 
were Loretta C. Argrett, Assistant Attorney General, and 
Richard Farber, Attorney.

 Before: Williams, Sentelle and Henderson, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Williams.

 Williams, Circuit Judge: In January 1990 AlliedSignal, a 
company manufacturing aerospace and automotive products, 
decided to sell its interest in Union Texas Petroleum Hold-
ings, Inc., an oil, gas, and petrochemical company. Anticipat-
ing a large capital gain, it sought to reduce the resulting tax 
burden by entering into a set of transactions via a partner-
ship with several foreign corporations. The transactions took 
advantage of provisions of the Internal Revenue Code (and 
related regulations) designed to yield reasonable results when 
property is sold on an installment basis and the value of the 
installment payments cannot be known in advance. With the 
help of these provisions, transactions that in substance added 
up to a wash were transmuted into ones generating tax losses 
of several hundred million dollars; the offsetting gains were 
allocated to foreign entities not subject to United States 
income tax at all.

 The Commissioner of Internal Revenue in 1996 issued a 
notice of final partnership administrative adjustment, reallo-
cating to AlliedSignal much of the capital gain accrued by the 
partnership. ASA, via its "Tax Matters Partner," Allied- 
Signal, petitioned for relief in the Tax Court, which agreed 
with the Commissioner that AlliedSignal had not entered into 
a bona fide partnership and upheld the Commissioner's deter-
mination. ASA Investerings Partnership, AlliedSignal, Inc., 
Tax Matters Partner v. Commissioner, 76 T.C.M. (CCH) 325 
(1998) ("Tax Court Decision"). We affirm.

 * * *

 The hardest aspect of this case is simply getting a handle 
on the facts. To make them manageable, we first discuss the 
principal tax provisions in question and then show their 
application through a series of examples, ending with a 
simplified version of the transactions here. Only then do we 
lay out the exact transactions themselves.

 Under the general provisions of the Internal Revenue Code 
("IRC"), gains and losses are generally "realized" in the year 
that they are received or incurred. See 26 U.S.C. s 1001 
(1994). A sale for future payments, however, presents sever-
al difficulties, among them that the deferred payment may be 
contingent in amount or otherwise not susceptible to accurate 
valuation. Section 453 of the Internal Revenue Code, 26 
U.S.C. s 453, provides methods for taxation of such an "in-
stallment sale," defined as "a disposition of property where at 
least 1 payment is to be received after the close of the taxable 
year in which the disposition occurs." Id. s 453(b)(1). It 
specifies the "installment method" for such a sale, providing 
that "the income recognized for any taxable year from a 
disposition is that proportion of the payments received in that 
year which the gross profit ... bears to the total contract 
price." Id. s 453(c). Thus, if A owns a building with a basis 
of $100, and sells it for $300 to be paid in five $60 annual 
installments, A recognizes a taxable gain of $40 each year. 
The proportion of "gross profit" to "total contract price" is 
200/300 or two thirds, so the income recognized for each year 
is two thirds of the receipts of that year.

 In 1980 Congress expanded s 453, authorizing the Secre-
tary to make the installment method available to deferred 
payment transactions for which the sales price is indefinite, or 
subject to a contingency. Section 453(j) (previously s 453(i)) 
mandates that the Secretary shall promulgate regulations 
"providing for ratable basis recovery in transactions where 
the gross profit or the total contract price (or both) cannot be 
readily ascertained." In response, the Treasury promulgated 
Temp. Treas. Reg. s 15A.453-1(c)(3)(i) (1981), which provides 
that in contingent payment sales (and subject to irrelevant 
exceptions), "the taxpayer's basis ... shall be allocated to the 
taxable years in which payment may be received under the 
agreement in equal annual increments."

 Under these regulations, the taxpayer will have a recog-
nized gain in years when payment from the sale exceeds the 
basis recovered; in years when payment is less than the basis 
recovered, "no loss shall be allowed unless the taxable year is 
the final payment year under the agreement or unless it is 

otherwise determined ... that the future payment obligation 
under the agreement has become worthless." Id.

 The following examples should illustrate the ratable basis 
recovery rule. Property owner, A, sells a house with a basis 
and current value of $1 million in exchange for an instrument 
that will pay unpredictable amounts (e.g., a share of the 
property's gross profits) over a five-year period. In any year 
in which the payout equals or exceeds $200,000, A will recover 
$200,000 in basis under the ratable basis recovery rule and 
will have a taxable gain equal to the difference between the 
amount received from the note and $200,000. In a year in 
which the payout is less than $200,000, A will not report a 
loss, but instead will recover a portion of the basis equal to 
the payout; the unused basis will then be carried forward to 
the next year. See id. s 15a.453-1(c)(3), example (2). Under 
the rule just quoted above, unused basis would be recovered 
only in the last year of scheduled payout.

 The rule works similarly when the seller receives both an 
instrument with indefinite value and an immediate payment 
of cash. In a variation on the preceding case, for example, 
suppose A sells the property for a $500,000 cash payment and 
an indefinite five-year instrument. Once again, the basis is 
recovered over the course of five years. In the first year, A 
recovers $200,000 in basis; because he has received $500,000 
that year, he must report a gain of $300,000. If A sells the 
note in Year 2 for $500,000, he can report a loss of $300,000, 
equal to the difference between the remaining basis in the 
note ($800,000) and the $500,000 he has received in exchange 
for the note.1 In this example, of course, the results are 
rather unappealing to the taxpayer: although he had no real 
gain, he recognized a nominal one early, offset by an equal 
tax loss--but one that was deferred and therefore not a 
complete offset. Because of the rule against any recovery of 

__________
 1 The regulation does not appear to provide expressly that in 
the event that the taxpayer completely liquidates the instrument 
before the end of scheduled payout he may recover all unused basis 
in that year. Both parties agree, however, that this is the case.

basis in excess of gross receipts in any year except the last, 
the taxpayer cannot manipulate the timing in his favor.

 But suppose A finds a way of allocating the nominal tax 
gain to a tax-free entity, reserving for himself a nominal tax 
loss? Here is how he might do it: He forms a partnership 
with a foreign entity not subject to U.S. tax, supplying the 
partnership with $100,000 and inducing the "partner" to 
supply $900,000. The "partnership" buys for $1,000,000 prop-
erty eligible for installment sale treatment under s 453, and, 
as the ink is drying on the purchase documents, sells the 
property, as in the last example, for $500,000 in cash and an 
indefinite five-year debt instrument. The cash payment pro-
duces a gain of $300,000, 90% of which goes to the nontaxable 
foreign entity. Then ownership adjustments are made so 
that A owns 90% of the partnership. In year 2 the instru-
ment is sold, yielding a tax loss of $300,000, 90% of which is 
allocable to A. Presto: A has generated a tax loss of 
$240,000 ($270,000 loss in Year 2, offset by $30,000 gain in 
Year 1), with no material change in his financial position--
other than receipt of the valuable tax loss. This example is 
AlliedSignal's case, stripped to its essentials.

 Now for the specifics of this case: In 1990, AlliedSignal 
anticipated that it would soon realize a capital gain of over 
$400 million from the sale of its interest in Union Texas 
Petroleum Holdings, Inc. In February, AlliedSignal ap-
proached Merrill Lynch & Co. to discuss a set of transactions 
that Merrill had developed to create tax losses to shelter 
anticipated capital gains.

 Under the plan AlliedSignal would form a partnership with 
a foreign entity, which in turn would supply the majority of 
the capital for and assume a majority stake in the partner-
ship. In Year 1, the partnership would purchase short-term 
private placement notes ("PPNs"), which can be sold under 
the installment method of accounting provided for in IRC 
s 453. See 26 U.S.C. s 453(k)(2)(A) (implying that the sale 
of "stock or securities which are [not] traded on an estab-
lished securities market" would be subject to the installment 
method). Several weeks later, the partnership would sell the 

instruments for 80% cash and 20% debt instruments, which 
would pay out over several years and thus would be subject to 
the ratable basis recovery rule. As in the example above, the 
partnership would report a large gain in the first year, equal 
to the difference between the substantial cash payment and 
the small share of basis recovered that year. The gain would 
be allocated according to each partner's interest, with the tax-
exempt foreign partner receiving the lion's share.

 The next year, AlliedSignal would acquire a majority inter-
est in the partnership, and sell the debt instruments. The 
sale would create a large tax loss because the basis available 
for recovery would far exceed the value of the instruments.

 Merrill would serve as the partnership's financial adviser 
and, for a $7 million fee, would recruit the foreign partner 
and arrange for the subsequent investments. Tax Court 
Decision, 76 T.C.M. at 326. Merrill would also "structure and 
enter into the requisite swap transactions" with the banks, 
"[t]o ensure a market for [the] issuance and sale" of the 
PPNs and the debt instruments to be received on their sale. 
Id. In exchange for serving as the partnership's financial 
intermediary, Merrill would receive roughly $1 to 2 million on 
the initial sale of PPNs, and $200,000 to $400,000 on the sale 
of the subsequent debt instruments. Id. The foreign part-
ner would receive the greater of $2,850,000 or 75 basis points 
(1 basis point = .01%) over the London International Bank 
Offering Rate ("LIBOR") on any funds contributed to the 
partnership, as well as reimbursement of all partnership 
expenses incurred. Id.

 AlliedSignal and Merrill followed the proposal to the letter. 
Merrill contacted Algemene Bank Netherlands N.V. ("ABN"), 
one of the Netherlands' largest commercial banks. Id. at 327. 
ABN had previously participated in similar Merrill transac-
tions, and anticipated that this partnership would strengthen 
its preexisting lending relationship with AlliedSignal. Id. 
On April 5, 1990 Johannes den Baas, Vice President of 
Corporate Finance for ABN New York, an ABN affiliate, 

requested authorization to enter into this venture. Id. Den 
Baas recommended the creation of two "special purpose 
corporations" ("SPCs"), to which ABN would lend $990 mil-
lion, and which would then contribute this money to the 
venture. Id. The purpose of this structure, den Baas said, 
was (1) to permit ABN, which would otherwise be a general 
partner in the venture with AlliedSignal, to limit its exposure 
to liability, and (2) to facilitate ABN's shifting part of the loan 
to other banks for various reasons.

 On April 17 and 18, den Baas and another representative of 
an ABN affiliate met in Bermuda with a representative of 
AlliedSignal. Id. Both sides agreed that AlliedSignal would 
pay all partnership expenses, as well as ABN's costs funding 
the requisite loans to the partnership (approximately 
LIBOR), plus 75 basis points. Id. at 328.2 The precise 
amount, of course, would depend on the amount that ABN 
contributed and how long the partnership, to be known as 
ASA Investerings, held those funds. In response to den 
Baas's request that AlliedSignal pay $5 million up-front, the 
parties agreed that AlliedSignal would instead periodically 
make "premium" payments upon the occurrence of certain 
events. Id. The agreements reached during these negotia-
tions were referred to by the Tax Court as the "Bermuda 
Agreement."

 ABN's Risk Management Division expressed concern that a 
loss might arise out of the sale of the PPNs. Id. at 327. Den 
Baas responded by assuring these officials that any such loss 
would be added to the value of the subsequent debt instru-
ments, and would in turn be borne by AlliedSignal on liqui-
dation of those instruments. But there could be no written 
agreement to this effect, explained den Baas, because "in that 
case it would not be a matter of a general partnership." Id.; 

__________
 2 Petitioner acknowledges that ABN might have "had in mind a 
target return of LIBOR plus 75bp on the amount it invested," 
Petitioner's Initial Br. at 59, but argues that the Tax Court erred in 
finding that the parties actually entered into such an agreement. 
Petitioner points to the fact that AlliedSignal's payments were 
negotiated rather than specified in advance, and were not based on 
a LIBOR plus 75 basis points return. This dispute is, however, 
immaterial. See infra pp. 16-17.

Memo from den Baas to Jos Albers, 4/22/90, Joint Appendix 
("J.A.") 676. Den Baas nonetheless assured the authorities at 
ABN of his confidence that AlliedSignal would bear any such 
loss:

 [T]he fact that the client is the only one who is interested 
 in such a sale and wants to obtain the installment note, 
 whereby the SPCs have a right of veto during the entire 
 procedure--as is, in fact, set forth in the partnership 
 document--makes ABN NY Corporate Finance more 
 than confident that the client will continue to have this 
 loss charged to his account in the future as well.
 
Id. The loan-approving committees later authorized ABN's 
participation.

 On April 19 ASA Investerings Partnership was formed. 
Tax Court Decision, 76 T.C.M. at 328. It consisted of Allied-
Signal, AlliedSignal Investment Corporation ("ASIC"), a 
wholly-owned subsidiary of AlliedSignal, and the two SPCs, 
Barber Corp. N.V. and Domniguito Corp. N.V., which were 
controlled by foundations in turn controlled by ABN. Barber 
and Dominguito entered into revolving credit agreements 
with ABN. The foundations which owned the SPCs granted 
ABN an irrevocable option to buy shares of the respective 
SPCs at par value. Id.

 On April 19th and 24th, the partners contributed a total of 
$850 million, with each partner receiving a partnership inter-
est in accordance with its contribution. AlliedSignal's share 
was 10%, the SPCs' 90%. In May 1990, the parties supple-
mented their contributions (in the same ratio), bringing the 
total contribution to $1.1 billion.

 On April 25, 1990 ASA purchased from two Japanese banks 
$850 million of 5-year floating rate notes which were not 
traded on an established securities market--the planned 
PPNs. Id. at 329. On May 8, the partnership met in 
Bermuda and decided to sell the PPNs for 80% cash and 20% 
LIBOR notes. Id. Between May 17 and May 24 (i.e., within 
one month of purchase), ASA sold the PPNs to two banks in 
exchange for a little under $700 million in cash and 11 notes. 
(With the cash it bought time deposits and 30-day commercial 

paper.) These notes each made 20 quarterly payments con-
sisting of the 3-month LIBOR rate, calculated at the begin-
ning of each payment period, applied to 25% of the notional 
principal amount, which in this case was $434,749,000. Id. 
The LIBOR notes did not require a return of principal at 
maturity; rather, the quarterly payments of interest on the 
"notional amount" can be seen as both interest and return of 
actual principal. ABN entered into swap transactions with 
Merrill, Barber and Dominguito to hedge ABN's interest rate 
risk relating to the LIBOR notes. Merrill also entered into 
swap transactions with the banks from whom it bought the 
LIBOR notes (as it had with the PPNs) to induce their 
participation. Merrill's transaction costs in selling the PPNs 
were $6.375 million. Id. This was added to the value of the 
LIBOR notes in ASA's partnership books, so that Allied- 
Signal would bear the costs of the sale when it acquired the 
LIBOR notes from the partnership. Id. at 329-330.

 Because the LIBOR notes provided for 20 quarterly pay-
ments at a variable rate, and the PPNs were not sold on an 
established securities market, the sale of the PPNs qualified 
for use of the installment method. For the taxable year 
ending May 31, 1990, ASA recovered 1/6 of the basis in the 
PPNs (because the completion of the scheduled payout would 
occur in the sixth tax year after the sale, and reported 
$549,443,361 in capital gains (= $681,300,000 in cash minus 
1/6($851,139,836)).3 Id. at 331. The gain was allocated ac-
cording to partnership interest, 90% to the SPCs and 10% to 
AlliedSignal and ASIC. Id.

 On August 2, 1990, AlliedSignal issued $435 million in 
commercial paper, and with the proceeds purchased Barber's 
entire interest in ASA for about $400 million and a 13.43% 
interest in ASA from Dominguito for about $150 million. 
Between November 1991 and April 1992, ASA further re-
duced Dominguito's interest to 25%. AlliedSignal also paid a 
$4.4 million "premium" payment, representing a portion of 

__________
 3 The parties stipulated in the Tax Court that ASA had erred in 
calculating the gain on its 1990 tax return and that the correct 
amount was $539,364,656.

the $5 million requested by den Baas. After this purchase, 
AlliedSignal and ASIC entered into several swaps with Mer-
rill to hedge their interest in the LIBOR notes. Id. at 330. 
Between August 31 and September 28 AlliedSignal borrowed 
$435 million from ASA, using the proceeds to repay the debt 
incurred August 2; this indebtedness was paid off May 1, 
1992.

 On August 21 the partnership authorized a distribution of 
the LIBOR notes to AlliedSignal and ASIC, and about $116 
million in cash and commercial paper to Dominguito. Id. at 
331. During 1990, AlliedSignal and ASIC sold a fraction of 
the LIBOR notes with a basis of $246,520,807, for a total of 
$50,454,103, and reported a capital loss equal to the differ-
ence, $196,066,704. Id. That year, AlliedSignal also reported 
a capital gain of $53,926,336, its share of ASA's capital gain 
from the sale of the PPNs. Id.

 On December 5, 1991, AlliedSignal made a direct payment 
of $1,631,250 to Dominguito, representing: the difference 
between ABN's funding costs and the SPCs' combined income 
allocations; interest on $92 million of ABN's funds that 
remained in ASA beyond the agreed upon date; and the 
difference (plus interest) between the $5 million up-front 
payment that ABN had requested and the $4.4 million it had 
previously paid. Id.

 Prior to liquidation, ABN and AlliedSignal agreed that 
ABN would refund $315,000, reflecting excesses of the SPCs' 
income allocations over funding costs, and of ASA's returns 
from November 22, 1991 through April 30, 1992 over LIBOR. 
Id. at 332. On June 1, 1992, the partners liquidated ASA. 
On November 31, AlliedSignal sold its remaining LIBOR 
notes for $33,431,000, and recovered the remainder of the 
basis, $429,655,738, taking a capital loss of $396,234,738. Id.

 In a notice of final partnership administrative adjustment 
the Commissioner disallowed ASA's capital gain, reallocating 
it to AlliedSignal and ASIC and thus in substance cancelling 
out the tax losses otherwise enjoyed by AlliedSignal. Id. at 
333. The Commissioner relied on alternative grounds: first, 
ASA was not a bona fide partnership, and Barber and Domin-

guito were not correctly deemed partners; and second, the 
transactions lacked "economic substance." Id.

 * * *

 The Tax Court agreed with the Commissioner that ASA 
was not a valid partnership for tax purposes, and thus did not 
reach the economic substance argument. At the outset, the 
court disregarded Barber and Dominguito "[f]or purposes of 
[its] analysis," Tax Court Decision, 76 T.C.M. at 333, finding 
that they were merely ABN's agents. First, they were thinly 
capitalized, and created just for purposes of the venture. 
Second, the parties themselves treated ABN as the partner, 
disregarding Barber and Dominguito. Third, Barber and 
Dominguito were "mere conduits," to whom ABN lent funds 
and in whom ABN owned options to purchase shares for a de 
minimis amount.

 Having found ABN to be the relevant party, the Tax Court 
turned its attention to the question whether AlliedSignal and 
ABN entered into a bona fide partnership. Although the 
Internal Revenue Code provides that "the term 'partnership' 
includes a syndicate, group, pool, joint venture, or other 
unincorporated organization through or by means of which 
any business, financial operation, or venture is carried on," 26 
U.S.C. s 761, the court set out to determine whether the 
formal partnership had substance, quoting the Supreme 
Court's language in Commissioner v. Culbertson, 337 U.S. 
733, 742 (1949), which said that the existence of the partner-
ship (for tax purposes) would depend on whether, "consider-
ing all the facts ... the parties in good faith and acting with a 
business purpose intended to join together in the present 
conduct of the enterprise." Applying this test, the Tax Court 
concluded that AlliedSignal and ABN did not have "the 
requisite intent to join together for the purpose of carrying 
on a partnership." 76 T.C.M. at 335.

 * * *

 We review decisions of the Tax Court "in the same manner 
and to the same extent as decisions of the district courts in 

civil actions tried without a jury." 26 U.S.C. s 7482. Factual 
findings are reviewed for clear error, see Commissioner v. 
Duberstein, 363 U.S. 278, 291 (1960), and determinations of 
law de novo. See United States v. Popa, 187 F.3d 672, 674 
(D.C. Cir. 1999). We have held that in tax cases mixed 
questions of law and fact are to be treated like questions of 
fact. See Fund for the Study of Economic Growth and Tax 
Reform v. IRS, 161 F.3d 755, 759 (D.C. Cir. 1998) (citing 
Duberstein, 363 U.S. at 289 n.11). Petitioner poses chal-
lenges to all three types of decisions constituting the Tax 
Court judgment.

 Much of petitioner's opening brief is directed to an attack 
on the Tax Court's reasoning. We confess that some of that 
reasoning seems misdirected. For example, the court 
seemed to believe that because ABN and AlliedSignal had 
"divergent business goals," 76 T.C.M. at 333, they were 
precluded from having the requisite intent to form a partner-
ship. We agree with petitioner that partners need not have a 
common motive. In fact, the desirability of joining comple-
mentary interests in a single enterprise is surely a major 
reason for creating partnerships. But we see no reason to 
think that this view, mentioned only in the opinion's initial 
summary and concluding paragraph, was essential to the 
court's conclusion.

 Some of petitioner's argument seems an exercise in seman-
tic ju jitsu. It argues that we may not consider whether the 
partnership was a "sham" because the Tax Court (a) explicitly 
refused to consider that, and (b) never used the word "sham." 
The first point is false, the second irrelevant. Although the 
Tax Court said that it would not consider whether the trans-
actions at issue lacked "economic substance," id., its decision 
rejecting the bona fides of the partnership was the equivalent 
of a finding that it was, for tax purposes, a "sham."

 Getting to the controlling issue, petitioner argues that 
under the standard established in Moline Properties, Inc. v. 
Commissioner, 319 U.S. 436 (1943), the partnership cannot be 
regarded as a sham. The Court there said that a corporation 

remains a separate taxable entity for tax purposes "so long as 
[its] purpose is the equivalent of business activity or is 
followed by the carrying on of business by the corporation." 
319 U.S. at 439. The Tax Court has since applied Moline to 
partnership cases. See Bertoli v. Commissioner, 103 T.C. 
501, 511-12 (1994).

 Petitioner views Moline as establishing a two-part test, 
under which a tax entity is accepted as real if either: (1) its 
purpose is "the equivalent of business activity" (not tax 
avoidance), or (2) it conducts business activities. Moline, 319 
U.S. at 439. Because ASA "engaged in more than sufficient 
business activity to be respected as a genuine entity," peti-
tioner argues that ASA was a partnership under the second 
alternative. Petitioner's Reply Br. at 12. We agree if engag-
ing in business activity were sufficient to validate a partner-
ship ASA would qualify. It was infused with a substantial 
amount in capital ($1.1 billion), and invested it in PPNs, 
LIBOR notes, and other short-term notes over a period of 
two years. In fact, however, courts have understood the 
"business activity" reference in Moline to exclude activity 
whose sole purpose is tax avoidance. This reading treats 
"sham entity" cases the same way the law treats "sham 
transaction" cases, in which the existence of formal business 
activity is a given but the inquiry turns on the existence of a 
nontax business motive. See Knetsch v. United States, 364 
U.S. 361, 364-66 (1960). Thus, what the petitioner alleges to 
be a two-pronged inquiry is in fact a unitary test--whether 
the "sham" be in the entity or the transaction--under which 
the absence of a nontax business purpose is fatal.4

 Shortly after Moline the Second Circuit held per Judge 
Learned Hand in National Investors Corp. v. Hoey, 144 F.2d 
466 (2d Cir. 1944), that the retention and sale of securities, 
after the date when the corporate holding had served its 

__________
 4 Indeed, one might logically enough place the Tax Court's 
findings here under the "sham transaction" heading, viewing the 
formation of the partnership as the transaction. Because of the 
ultimate unity of the tests, however, there is no need to address this 
formulation.

nontax goals, could not be considered for tax purposes. 
There an investment trust corporation proposed to merge 
with its subsidiaries. To this end it created a new corpora-
tion into which it transferred its interests in the subsidiaries 
in exchange for 10 shares of stock. But the stockholders 
decided to reject the plan to unify the four corporations. The 
investment trust then liquidated the new corporation, starting 
with an exchange of 10% of the new corporation's shares and 
taking a deduction based on the difference between the value 
of 10% of the shares when originally issued to the trust, and 
10% of their reduced value a year later. In initiating even 
this 10% liquidation, however, it delayed for some time after 
the shareholders' vote. The court held that the trust was 
entitled to a deduction only for value decreases incurred from 
the time of the original transfer of assets to the corporation 
to "a reasonable time" after the stockholders rejected the 
plan. Id. at 468. Thereafter, "there was no longer any 
business for [the corporation] to do." Id. Retention of the 
corporation merely for the purpose of tax minimization was 
not enough. The court explicitly read the cases as saying 
that "the term 'corporation' will be interpreted to mean a 
corporation which does some 'business' in the ordinary mean-
ing, and that escaping taxation is not 'business' in the ordi-
nary meaning." Id. So too, for ASA: Although its invest-
ment in LIBOR notes might have had a business purpose, the 
prior three-week investment in and subsequent sale of PPNs 
was, like the retention of assets in Hoey, a business activity 
merely conducted for tax purposes.5 Moreover, as discussed 
later, AlliedSignal's interest in any potential gain from the 
partnership's investments was in its view at all times dwarfed 
by its interest in the tax benefit.

__________
 5 The PPNs cost $850 million. When an expert was later 
engaged by AlliedSignal to evaluate the partnership's gains and 
losses, AlliedSignal asked that he assign to the LIBOR notes a 
value which, together with the cash, would bring the total value of 
the proceeds of the PPNs to $850 million. See J.A. 1343. Allied-
Signal evidently did not believe that the initial investment in PPNs 
increased the return from the transactions in the aggregate.

 The Ninth Circuit has similarly held that "business activi-
ty" is inadequate in the absence of a nontax business purpose. 
In Zmuda v. Commissioner, 731 F.2d 1417 (9th Cir. 1984), 
the taxpayers argued that the Tax Court incorrectly applied 
the "economic substance" rule rather than the "business 
purpose" rule. The court found that the taxpayer's argument 
"attempts to create a distinction where none exists. There is 
no real difference between the business purpose and the 
economic substance rules. Both simply state that the Com-
missioner may look beyond the form of an action to discover 
its substance." Id. at 1420. The court went on to say:

 The terminology of one rule may appear in the context of 
 the other because they share the same rationale. Both 
 rules elevate the substance of an action over its form. 
 Although the taxpayer may structure a transaction so 
 that it satisfies the formal requirements of the Internal 
 Revenue Code, the Commissioner may deny legal effect 
 to a transaction if its sole purpose is to evade taxation.
 
Id. at 1421. At issue was the validity of certain trusts, so the 
court's equation of the "transaction" test and the "entity" test 
was clearly a holding.

 We note that the "business purpose" doctrine is hazardous. 
It is uniformly recognized that taxpayers are entitled to 
structure their transactions in such a way as to minimize tax. 
When the business purpose doctrine is violated, such struc-
turing is deemed to have gotten out of hand, to have been 
carried to such extreme lengths that the business purpose is 
no more than a facade. But there is no absolutely clear line 
between the two. Yet the doctrine seems essential. A tax 
system of rather high rates gives a multitude of clever 
individuals in the private sector powerful incentives to game 
the system. Even the smartest drafters of legislation and 
regulation cannot be expected to anticipate every device. 
The business purpose doctrine reduces the incentive to en-
gage in such essentially wasteful activity, and in addition 
helps achieve reasonable equity among taxpayers who are 
similarly situated--in every respect except for differing in-
vestments in tax avoidance.

 Thus the Tax Court was, we think, sound in its basic 
inquiry, trying to decide whether, all facts considered, the 
parties intended to join together as partners to conduct 
business activity for a purpose other than tax avoidance. Its 
focus was primarily on ABN, curiously. As we shall discuss 
later, the absence of a nontax business purpose was even 
clearer for AlliedSignal. Nonetheless, given ABN's protec-
tion from risk, and even from the borrowing costs of provid-
ing its capital contribution, there was no clear error in the 
finding that its participation was formal rather than substan-
tive.6 Petitioner alleges two primary ways in which the Tax 
Court erred in this regard.

 First, petitioner says that the Tax Court incorrectly found 
that Barber and Dominguito were mere agents of ABN 
rather than partners in their own right. But this issue of 
classification makes no material difference. Once the court 
decided that the SPCs were mere conduits for ABN, it shifted 
its focus to whether AlliedSignal and ABN (rather than the 
SPCs) formed a bona fide partnership. There was certainly 
no clear error in the court's view of the SPCs as being within 
the complete control of ABN, and there is no indication as to 
how the SPCs' intent as to the "partnership" differed from 
that of ABN.

 Second, petitioner argues that the Tax Court erred by 
finding that ABN did not share in profits and losses because 
it received a specified return from AlliedSignal and hedged 
against risk through swap transactions with Merrill. On the 
profit side, we find no clear error in the court's findings that 
the direct payments made to ABN were to compensate it 
merely for its funding costs. Petitioner says that there was 
no explicit agreement that ABN would receive a return of 
LIBOR plus 75 basis points, pointing to the fact that the 
payments actually made by AlliedSignal to ABN did not 

__________
 6 Although petitioner argues that ABN's purpose was not tax-
avoidance, but rather "included a desire to enhance its business 
relationship with AlliedSignal," Petitioner's Initial Br. at 41 n.19, 
the desire to aid another party in tax avoidance is no more a 
business purpose than actually engaging in tax avoidance.

produce such a return. See Petitioner's Brief at 59; supra 
note 2. But petitioner makes no argument that these pay-
ments were related to the success of the partnership's invest-
ments (i.e., the PPNs and LIBOR notes), and under the 
circumstances it is reasonable to infer that they were made 
pursuant to a pre-arranged agreement to compensate ABN 
for its funding costs (plus some amount above LIBOR, even if 
not 75 basis points).

 Den Baas's testimony, moreover, confirms that ABN could 
make no profit from the transaction: any potential profit 
from the LIBOR notes would be offset by losses from the 
concomitant swap transactions. Petitioner cites Hunt v. 
Commissioner, 59 T.C.M. (CCH) 635 (1990), for the proposi-
tion that a guaranteed return is not inconsistent with partner-
ship status. In Hunt, however, both parties had a bona fide 
business purpose for entering into the partnership, and unlike 
in the case at hand, the guaranteed return created a floor but 
not a ceiling. See id. at 648.

 Turning to the risk of loss, we agree with the Tax Court 
that any risks inherent in ABN's investment were de minimis. 
As a preliminary matter, the court did not err by carving out 
an exception for de minimis risks, as no investment is entirely 
without risk. Unless one posited a particular asset (such as 
the dollar) as the sole standard, its value could change in 
relation to the values of other assets, and treating one--even 
the dollar--as the sole standard would be arbitrary. The Tax 
Court's decision not to consider ABN's "de minimis" risk is 
also consistent with the Supreme Court's view, albeit in the 
"sham transaction" context, that a transaction will be disre-
garded if it did "not appreciably affect [taxpayer's] beneficial 
interest except to reduce his tax." Knetsch, 364 U.S. at 366 
(emphasis added) (quoting Gilbert v. Commissioner, 248 F.2d 
399, 411 (2d Cir. 1957) (Hand, C.J., dissenting)).

 There was no clear error in the Tax Court's determination 
that at no point during the transaction did ABN assume 
greater than de minimis risk. The PPNs were essentially 
risk free: not only were they issued by banks with the 
highest credit ratings but they were held for a mere three 

weeks. Moreover, because of the side agreement under 
which any loss on the PPNs would be embedded in the value 
of the LIBOR notes, AlliedSignal would bear any shortfall 
over the brief period in which PPNs were held. Petitioner 
argues that ABN was subject to the risk that AlliedSignal 
would ultimately decide not to acquire the LIBOR notes. 
This seems unlikely to the point of triviality, however, for two 
reasons: first, this step was integral to AlliedSignal's tax 
objective, and to the entire transaction; and second, at the 
point when the LIBOR notes would be distributed, Domingui-
to still owned over 40% of ASA, and according to the partner-
ship agreement, any act of the partnership committee would 
require the consent of partners whose interest equaled or 
exceeded 95%. Nor was there any real hazard that Allied- 
Signal might agree to distribute the LIBOR notes but refuse 
to make the adjustment for any loss on the PPNs: as den 
Baas had stated in a memorandum to ABN officials, the SPCs 
could counter by refusing consent for the distribution of the 
notes altogether.

 The LIBOR notes certainly had greater inherent risk than 
the short-term PPNs; ABN, however, entered into hedge 
transactions outside the partnership to reduce the risk to a de 
minimis amount. In fact, the correlation between the swaps 
and the LIBOR notes was 99.999%, i.e., the company succeed-
ed in hedging all but a de minimis amount of the risk 
associated with the LIBOR notes. Petitioner concedes that 
"the hedges provided the ABN parties with substantial pro-
tection from fluctuations in LIBOR Note value due to move-
ments in interest rates." Petitioner's Reply Br. at 18. But 
ASA nevertheless contends that ABN still bore the credit risk 
associated with the issuers of the LIBOR notes and with 
Merrill, which provided the hedges. Once again, we find that 
the Tax Court correctly found the risk to be de minimis: the 
LIBOR notes were issued by banks having a credit rating of 
AAA and AA+, and were held by ASA for only three months. 
So too, the risk associated with the swaps with Merrill (a 
single-A rated institution) was de minimis. Finally, there was 
little, if any, risk associated with the commercial paper that 
ASA held at this point, which although unhedged, was found 

by the Tax Court to be "AAA-rated, short-term, and from 
multiple issuers." Tax Court Decision, 76 T.C.M. at 335.

 Petitioner argues that ABN's side-transactions should not 
be considered in deciding whether a bona fide partnership 
was formed. It draws an analogy to a partnership which 
owns an uninsured building later destroyed by fire; this 
partnership is bona fide even if one partner had insured 
against his portion of the loss. The analogy, though imagina-
tive, is not very telling. The insurance in the hypothetical is 
comparatively narrow, leaving a considerable range of poten-
tial business hazards and opportunities for profit. Contrast 
den Baas's observation at the outset of the present plan: 
"Credit risk: The structure demands that virtually no credit 
risk will be taken in the partnership since any defaults on the 
principal of the investments will jeopardize the objective.... 
Market interest rate risk: ABN New york [sic] will take care 
of perfect hedges in order to protect the bank from the 
changes in the value of the underlying securities.... due to 
interest rate fluctuations." J.A. 680-81. We note, moreover, 
that petitioner directs us to no evidence that ABN even bore 
the cost of these hedges. Given that Merrill, which had 
orchestrated the entire transaction and to whom AlliedSignal 
had paid a substantial sum, engaged in the swap transactions, 
it is likely that AlliedSignal assumed the costs of the swaps. 
A partner whose risks are all insured at the expense of 
another partner hardly fits within the traditional notion of 
partnership.

 Petitioner argues that the Tax Court also erred in deter-
mining that ABN's capital contribution constituted a loan. 
We need not pass on this question because it is quite periph-
eral to the central issue of whether the parties entered into a 
bona fide partnership.

 We noted earlier that the Tax Court's focus on ABN's 
intentions was a little puzzling. AlliedSignal, after all, was 
the driving force and AlliedSignal focused on tax minimization 
to the virtual exclusion of ordinary business goals. Of course 
no one wants to pay more than necessary, even for a very 
profitable tax minimization scheme, and the petitioner argues 

that even with the very substantial transaction costs associat-
ed with the partnership, AlliedSignal had grounds for expect-
ing that it would come out more than $15 million ahead. As it 
proved, transaction costs were almost $25 million rather than 
the roughly $12 million it anticipated, Tax Court Decision, 76 
T.C.M at 326, 332, so the ultimate financial gain, according to 
the parties, was actually about $3.6 million. The expected 
gain turned on the belief of Roger Matthews, AlliedSignal's 
assistant treasurer--which proved correct--that interest 
rates would shift in such a way that, when all the swaps were 
taken into account, AlliedSignal would benefit. But this 
evidence says nothing about AlliedSignal's use of the elabo-
rate partnership--with a pair of partners concocted for the 
occasion. There is no reason to believe that AlliedSignal 
could not have realized Matthews's interest rate play without 
the partnership at far, far lower transactions costs. For the 
deal overall, the most telling evidence is the testimony of 
AlliedSignal's Chairman and CEO, who could not "recall any 
talk or any estimates of how much profit [the transaction] 
would generate." The Tax Court concluded that none of the 
supposed partners had the intent to form a real partnership, 
a conclusion that undoubtedly encompasses AlliedSignal. 
And the record amply supports that finding.

 The decision of the Tax Court is

 Affirmed.